FILED

1  JAIKUMAR RAMASWAMY, Chief
2  Asset Forfeiture and Money Laundering Section (AFMLS) APR 24   AM 10: 23
3  DANIEL H. CLAMAN, Assistant Deputy Chief
   WOO S. LEE, Trial Attorney
4  Criminal Division
5  United States Department of Justice
6  1400 New York Avenue, N.W., 10th Floor
   Washington, D.C. 20530
7  Telephone:  (202) 514-1263, Woo.Lee@usdoj.gov
8
9  ANDRÉ BIROTTE, JR.
   United States Attorney
10 STEVEN R. WELK
11 Assistant United States Attorney
12 Chief, Asset Forfeiture Section
13 KATHARINE SCHONBACHLER
   Assistant United States Attorney (Cal. Bar No. 222875)
14 312 North Spring Street, 14th Floor
15 Los Angeles, California 90012
16 Telephone:  (213) 894-3172, Katie.Schonbachler@usdoj.gov
17
   Attorneys for Plaintiff
18 UNITED STATES OF AMERICA
19
                    UNITED STATES DISTRICT COURT
20
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
21
22 UNITED STATES OF AMERICA,        )  No. CV 14-03140-RGK(SSx)
23                                  )
             Plaintiff,             )
24                                  )  VERIFIED COMPLAINT FOR
        vs.                         )  FORFEITURE
25 $726,951.45 IN UNITI BANK FUNDS, )  IN REM
26                                  )
             Defendant.             )
27 ─────────────────────────────────)
28

                                1

The United States of America brings this claim against the defendant $726,951.45 in funds and alleges as follows:

## I.

## JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395(b).

## II.

## PERSONS AND ENTITIES

4. The plaintiff is the United States of America.

5. The defendant is $726,951.45 in bank funds ("Defendant Funds") seized from account number XXXXX-1091 held in the name of Century 21 Sunny Hills Escrow Division at Uniti Bank in Buena Park, California on February 12, 2014, pursuant to a federal seizure warrant issued by the Honorable Andrew J. Wistrich, United States Magistrate Judge of the U.S. District Court for the Central District of California.  Specifically, the Defendant Funds represent the net proceeds from the sale of the real property located at Port Manleigh Place in Newport Beach, California[1] ("Newport Beach Property"), that was titled in the name of the Port Manleigh Trust until it was sold on or about February 11, 2014.

6. The interests of the Port Manleigh Trust, Yoon Yang Ja, Park Sang Ah, Chun Jae Yong and Chun Doo-hwan may be adversely affected by these proceedings.

---

[1] Pursuant to Local Rule 5.2-1, full residential addresses and account numbers have been redacted from this Complaint.

2

7. The Defendant Funds are in the custody of the United States Marshals Service, where they shall remain subject to this court's jurisdiction during the pendency of this action.

## III.

## EVIDENCE SUPPORTING FORFEITURE

8. The Defendant Funds are traceable to corruption proceeds accumulated by Chun Doo-hwan ("President Chun"), former President of the Republic of Korea ("Korea").

9. President Chun solicited and accepted more than $200 million in bribes from Korean businesses while serving as Korea's president between 1980 and 1988. At Chun's criminal trial in Korea, the leaders of several major Korean corporations testified that while President Chun was in power, their businesses were compelled to pay millions of dollars in bribes to President Chun to (i) avoid being retaliated against by President Chun's administration for not making such payments, and (ii) receive favorable treatment from President Chun's administration in exchange for making such payments. As a result, despite earning less than approximately 20 million Korean Won ("KRW") (equivalent to approximately $20,000 U.S. Dollars ("USD")) per year as Korea's president, President Chun amassed an enormous cache of assets, comprised of tens of millions of dollars worth of funds in bank accounts, securities and financial instruments, collectively called a "Secret Fund," that he concealed from the Korean government.

10. President Chun and his associates then further manipulated this Secret Fund to launder President Chun's corruption proceeds through a web of assets and bank accounts controlled by multiple shell companies and nominees, including his father-in-law General Lee Kyu Dong ("General Lee") and Korea's National Security Planning Agency.

11.  Beginning in 2000, General Lee transferred more than $20 million in the form of bearer bonds from President Chun's Secret Fund to Chun Jae Yong ("J.Y. Chun"), President Chun's son.  J.Y. Chun used these funds to open dozens of bank accounts and acquire millions of dollars worth of assets in Korea and the United States, often in the names of various nominees.  One of these assets was a property J.Y. Chun acquired in Alpharetta, Georgia ("Georgia Property") in 2003.  J.Y. Chun then sold the Georgia Property in 2004, and contributed the proceeds of that sale – along with other monies from Chun's Secret Fund – to acquire the Newport Beach Property in 2005.  The Defendant Funds, which the United States seeks to forfeit, constitute the net sale proceeds of the Newport Beach Property, which J.Y. Chun and his wife Sang Ah Park ("Park") sold in February 2014.

A. **Background**

12.  On December 12, 1979, President Chun orchestrated a military coup d'etat against Korea's civilian government.  Foreign media reported that armed forces loyal to President Chun killed thousands of civilians who attempted to protest President Chun's seizure of power, including two thousand civilians in the City of Kwangju in May 1980.

13.  Soon after seizing power, President Chun declared martial law, dissolved the Korean parliament, and ordered the drafting of a new constitution.  On August 27, 1980, in an election in which President Chun was the only candidate, Korea's electoral college elected President Chun as the country's new president.

14.  After holding office for more than eight years, President Chun agreed to step down as president after civilian protests demanding free elections erupted in Seoul and several other Korean cities.

15.  Other than his official salary as a public official and a military officer, President Chun has had no other source of significant legitimate income in his lifetime.

16.  President Chun was convicted in 1996 by the Seoul District Court in Korea of accepting hundreds of millions of dollars worth of bribes while in office. At trial, the leaders of several major Korean corporations testified that they paid millions of dollars worth of bribes to President Chun at the "Blue House," a complex of buildings which serves as the official residence and executive office of the Korean president.  As a result, President Chun was found to have accumulated corruption proceeds totaling 220.5 billion KRW (approximately $220 million (USD) at the time of President Chun's conviction in 1996).

17.  In addition to bribery, President Chun was also charged and convicted in 1996 of murder, leading an insurrection against the republic, conspiring to commit an insurrection, participating in an insurrection, issuing illegal troop movement orders as an Army officer, and dereliction of duty.

18.  For these offenses, the Seoul District Court sentenced President Chun to death.  Additionally, because of the bribery conviction, President Chun was ordered to pay KRW 229.5 billion (approximately $229 million (USD)) in criminal restitution.   On appeal, the Korean Supreme Court affirmed the convictions, including the bribery conviction, and entered a final order of judgment against President Chun on April 17, 1997, at which time President Chun began serving his prison sentence.

19.  On December 22, 1997, President Kim Young-sam, Korea's then democratically-elected president, commuted President Chun's death sentence and released him from prison.  President Kim's commutation of President Chun's sentence, however, did not affect the Seoul District Court's restitution order.  As of August 2013, President Chun still owed KRW 167.2 billion (approximately $167.2 million (USD)) under the 1996 criminal restitution order.  Since 1997, President Chun has refused to comply with the Seoul District Court order and has insisted that he owns less than KRW 290,000 (approximately $290 (USD)) in assets.

## B. President Chun's Receipt of Corrupt Payments

20. Below is an outline of the bribes and kickbacks paid to President Chun in exchange for favorable treatment or for avoiding non-favorable treatment from the Korean government. As set forth below, and established at trial in Korea, President Chun received at least $217 million worth of bribes and kickbacks from major Korean corporations while serving as president. The representatives of several major Korean corporations testified at trial that between 1980 and 1988, while President Chun was Korea's head of state, their businesses had to pay millions of dollars to President Chun in order to (i) avoid being retaliated against by the Korean government for not making such payments, and (ii) receive favorable treatment by the government in exchange for making such payments.

21. Specifically, Tables 1A through 1G detail approximately $217 million (USD) worth of bribes and kickbacks that President Chun was convicted of receiving.

**Table 1A**
**KRW 3 Billion (Approximately $3 Million (USD)) in Bribes**
**Paid to Chun Between 1980 and 1981**

| Date of Bribe | Identity of Bribe Giver | Bribe Amount KRW/USD[2] | Details |
|---|---|---|---|
| Nov. 1980 | Cho Joong-hoon Hanjin Group (Parent company of Korean Airlines) | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Safety House at the Blue House while discussing the crash of a Korean Airlines flight near Seoul |
| Spring 1981 | Kim Woo-choong Daewoo Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |

[2] The U.S. Dollar equivalent is the approximate equivalent to the Korean Won at the contemporaneous rate of exchange.

6

### Table 1B
### KRW 8 Billion (Approximately $8 Million (USD)) in Bribes
### Paid to Chun in 1982

| Date of Bribe | Identity of Bribe Giver | Bribe Amount in KRW/USD | Details |
|---|---|---|---|
| Dec. 1982 | Chung Ju-yung Hyundai Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid at the Blue House |
| Dec. 1982 | Lee Byung-chul Samsung Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Dec. 1982 | Kim Woo-choong Daewoo Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |

### Table 1C
### KRW 16 Billion (Approximately $16 Million (USD)) in Bribes
### Paid to Chun in 1983

| Date of Bribe | Identity of Bribe Giver | Bribe Amount in KRW/USD | Details |
|---|---|---|---|
| July 1983 | Kim Jung-won Hanil Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| July 1983 | Kim Yong-san Kukdong Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Oct. 1983 | Cho Joong-hoon Hanjin Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid in President Chun's Office at the Blue House while discussing the downing of a Korean Airlines jet over the Soviet Union in 1983 |
| Dec. 1983 | Chung Ju-yong Hyundai Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid at the Blue House |
| Dec. 1983 | Lee Byung-chul Samsung Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid at the Blue House |
| Dec. 1983 | Kim Woo-choong Daewoo Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |

**Table 1D**
**KRW 26 Billion(Approximately $26 Million (USD)) in Bribes**
**Paid to Chun 1984**

| Date of Bribe | Identity of Bribe Giver | Bribe Amount KRW/USD | Details |
|---|---|---|---|
| June 1984 | Kim Jung-won Hanil Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| Oct. 1984 | Jang Sang-tae Dongkuk Steel | KRW 2 Billion/ ($2 Million USD) | Bribe paid at the Blue House |
| Nov. 1984 | Shin Kyuk-ho Lotte Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Nov. 1984 | Kim Suk-won SSangyong Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Safety House at the Blue House while discussing government authorization for the company to build a golf resort in Kangwon province |
| Nov. 1984 | Choi Soon-young Shindongah Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Nov. 1984 | Yang Chung-mo Kukje Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Dec. 1984 | Chung Ju-yong Hyundai Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| Dec. 1984 | Lee Byung-chul Samsung Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid at the Blue House |
| Dec. 1984 | Choi Won-suk Dongah Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| Dec. 1984 | Kim Woo-choong Daewoo Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Dec. 1984 | Kim Seoung-youn Hanhwa Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Reception Room at the Blue House |

**Table 1E**
**KRW 28.5 Billion (Approximately $28.5 Million (USD)) in Bribes**
**Paid to Chun in 1985**

| Date of Bribe | Identity of Bribe Giver | Bribe Amount KRW/USD | Details |
|---|---|---|---|
| Jan. 1985 | Cho Joong-hoon Hanjin Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Safety House at the Blue House |
| May 1985 | S.W. Kim Ssangyong Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Safety House at the Blue House |
| June 1985 | Jang Young-shin Aekyung Group | KRW 1.5 Billion/ ($1.5 Million USD) | Bribe paid at the Blue House while discussing government authorization to construct a golf resort in Gyeongi province |
| July 1985 | J.W. Kim Hanil Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| Sept. 1985 | Lee Byung-chul Samsung | KRW 2 Billion/ ($2 Million USD) | Bribe paid at the Blue House |
| Sept. 1985 | Park Sung-yop Kumho Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Nov. 1985 | Jang Sang-Tae Dongkuk Steel | KRW 1 Billion/ ($1 Million USD) | Bribe paid at the Blue House in the form of a promissory note |
| Dec. 1985 | Lee Byung-chul Samsung | KRW 2 Billion/ ($2 Million USD) | Bribe paid at the Blue House |
| Dec. 1985 | Choi Won-suk Dongah Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House while discussing that company's bid to build the Second Libya Man-made River Project in Korea |
| Dec. 1985 | Kim Woo-choong Daewoo Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Dec. 1985 | Chung Ju-yong Hyundai Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |

**Table 1F**
**KRW 42.5 Billion (Approximately $42.5 Million (USD)) in Bribes**
**Paid to Chun in 1986**

| Date of Bribe | Identity of Bribe Giver | Bribe Amount KRW/USD | Details |
|---|---|---|---|
| May 1986 | Jang Sang-Tae Dongkuk Steel | KRW 3 Billion/ ($3 Million USD) | Bribe paid at the Blue House |
| Sept. 1986 | Lee Byung-chul Samsung Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid at the Blue House |
| Sept. 1986 | Shin Kyuk-ho Lotte Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Sept. 1986 | Park Sung-yop Kumho Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Sept. 1986 | Koo Ja-Kyung Lucky Goldstar | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| Dec. 1986 | Chung Ju-yong Hyundai Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Safety House at the Blue House |
| Dec. 1986 | Lee Byung-chul Samsung Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid at the Blue House |
| Dec. 1986 | S.Y. Kim Hanwa Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Dec. 1986 | Choi Won-suk Dongah Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House while discussing environmental regulation of certain lands owned by Dongah near Incheon, Korea |
| Dec. 1986 | Chey Jong Hun SunKyong Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Dec. 1986 | Ryu Chan-woo Poongsan Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid at the Blue House |
| Dec. 1986 | Jang Chi-hyuk Kohap Group | KRW 500 Million/ ($500,000 USD) | Bribe paid in the Reception Room at the Blue House |
| Dec. 1986 | S. W. Kim Ssangyong | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Safety House at the Blue House |

| | Group | | |
|---|---|---|---|
| Dec. 1986 | Lim Chang-wook Miwon Group | KRW 7 Billion/ ($7 Million USD) | Bribe paid in the Blue House while discussing the Korean National Tax Service's audit of the company |

### Table 1G
### KRW 93 Billion (Approximately $93 Million (USD)) in Bribes Paid to Chun in 1987

| Date of Bribe | Identity of Bribe Giver | Bribe Amount KRW/USD | Details |
|---|---|---|---|
| Jan. 1987 | Shin Kyuk-ho Lotte Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Reception Room at the Blue House |
| March 1987 | Cho Joon-hoon Hanjin Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid at the Blue House while discussing the Korean National Tax Service's audit of the Hanjin Group |
| May 1987 | Jang Chi-hyuk Kohap Group | KRW 500 Million/ ($500,000 USD) | Bribe paid in the Reception Room at the Blue House |
| June 1987 | Lee Byung-chul Samsung Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid at the Blue House |
| June 1987 | Kim Hyun-chul Sammi Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Safety House at the Blue House |
| July 1987 | Lee Jun-young Daelim Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Safety House at the Blue House |
| Aug. 1987 | S.W. Kim SSangyong Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid in the Safety House at the Blue House |
| Sept. 1987 | Chey SunKyong Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Sept. 1987 | S.Y. Kim Hanwa Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Sept. 1987 | Park Kumho Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Sept. 1987 | Cho Sook-rae Hyosung Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid at the Blue House |

| | | | |
|---|---|---|---|
| Sept. 1987 | Kim Sun-hong Kia Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Sept. 1987 | Park Young-joon Chunhung Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Oct. 1987 | Park Yong-gon Doosan Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Reception Room  at the Blue  House |
| Oct. 1987 | Kim Young-san Kukdong Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid at the Blue  House |
| Oct. 1987 | Choi Soon-young Shindongah Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Oct. 1987 | Baek Yeong-gi TongKook Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in the Reception Room at the Blue  House |
| Oct. 1987 | Choi Won-Suk Dongah Group | KRW 3 Billion/ ($3 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Oct. 1987 | Lee Dong Chan Kolon Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Safety House at the Blue House |
| Oct. 1987 | Park Yong-hak Daenon Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Oct. 1987 | Shin Kyuk-ho Lotte Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Oct. 1987 | Koo Ja-Kyung Lucky Goldstar | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| Oct. 1987 | Kim Woo-choong Daewoo Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Oct. 1987 | Cho Joong-hoon Hanjin Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Safety House at the Blue House |
| Oct. 1987 | Chey Jong Hun Sunkyong Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Reception Room at the Blue House |

| Nov. 1987 | Shin Kyuk-ho Lotte Group | KRW 5 Billion/ ($5 Million USD) | Bribe paid in the Reception Room at the Blue House |
|---|---|---|---|
| Nov. 1987 | Kim Jun-ki Dongbu Group | KRW 2 Billion/ ($2 Million USD) | Bribe paid in the Reception Room at the Blue House |
| Nov. 1987 | Choi Moo Young Geunyoung Nongsan Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Nov. 1987 | Han Young-ja Samyang Chemical | KRW 10 Billion/ ($10 Million USD) | Bribe paid in President Chun's Office at the Blue House |
| Dec. 1987 | Chung Ju-yong Hyundai Group | KRW 1 Billion/ ($1 Million USD) | Bribe paid at the Blue House |

22. The corruption payments set forth in Table 1A through 1G were funneled into President Chun's Secret Fund, which was comprised of a portfolio of bank accounts and assets maintained in the names of various shell companies and nominees.

23. While President Chun was in office between 1980 and 1988, his Secret Fund was managed by Kim Jong Sang, the Blue House Presidential Security Office's financial secretary. Some of these funds were laundered through accounts in Korea controlled by the Korean National Security Planning Agency and opened in the names of various shell companies including, Woojoo Hongbo Company and the Taeyang Munhwa Association.

24. After leaving office in 1988, President Chun transferred millions of dollars from the Secret Fund to General Lee, his father-in-law. When President Chun was questioned by Korean prosecutors (the "Korean Prosecutor") in 2004, he explained that he "gave money to [General Lee] in 1996, because [President Chun] feared that there may be a misunderstanding and that the money may be seized later, if [he] had a lot of money while [he] was being investigated" for

corruption during the 1990s.

**C. Between 2000 and 2003, General Lee Transferred Approximately $23 Million Worth of Funds and Bearer Bonds Traceable to President Chun's Secret Fund to J.Y. Chun**

25.   In spite of the fact that President Chun claimed to own less than $290 in assets in 1997, beginning in 2000, General Lee undertook a series of transactions that resulted in approximately $23 million of President Chun's assets, mainly in the form of bearer bonds,[3] to J.Y. Chun, the former President's son. Given that President Chun never earned more than $20,000 per year as a public official, and was convicted of receiving more than $200 million in corruption proceeds between 1980 and 1988, these assets transferred to J.Y. Chun are traceable to President Chun's Secret Fund.

26.   J.Y. Chun completed his undergraduate education at Georgetown University in 1988 and studied at Keio University in Japan between 1994 and 1999, where he earned a master's degree and a doctorate in economic accounting. After graduating from Keio University at the age of 38, J.Y. Chun worked between 1999 and 2000 at Daewoo Securities.  Prior to 1999 and his graduation from Keio University, J.Y. Chun was a full-time student and not gainfully employed for any significant period of time.

27.   Between 2000 and in or around July 29, 2003 (the "Relevant Period"), J.Y. Chun received more than $23 million (USD) worth of currency and bearer bonds traceable to President Chun's Secret Fund from his maternal grandfather, General Lee.

28.   With the assistance of his then friend and business partner Ryu Chang-hee ("Ryu"), J.Y. Chun maintained these assets in dozens of accounts ("J.Y. Chun Nominee Accounts") opened in the names of nearly two dozen different family

---

[3] Bearer bonds are unregistered financial debt securities issued by a financial institution or corporation.  The bonds are redeemable in cash by the person or entity in physical possession of the unregistered note.

members, friends, and associates ("J.Y. Chun Fund Nominees"), including:

1.     Park Sang-ah (J.Y. Chun's wife);

2.     Yoon Yang-ja (Park's mother);

3.     Kim Cheul-soo (Ryu's friend);

4.     Ryu Bong-soo (Ryu's father);

5.     Kim Gui-rye (Ryu's mother);

6.     Kim Moon-ja (Ryu's aunt);

7.     Kim Tae-eun (Ryu's aunt's daughter-in-law);

8.     Kim Soo-chang (Ryu's friend);

9.     Eom Seung-tae (Ryu's friend);

10.     Kim Do-sung (Ryu's friend);

11.     Oh Dong-hwan (Ryu's friend);

12.     Kim Sung-hyun (Ryu's friend);

13.     Kim Kang-hun (Ryu's friend);

14.     Jin Sung-il (Ryu's friend);

15.     Byun Joong-ho (Ryu's friend);

16.     Ahn Byung-kuk (Ryu's associate);

17.     Cha Tae-seon (Ryu's associate);

18.     Oh Sang-jin (Ryu's associate);

19.     Lee Joong-yeob (Ryu's associate);

20.     Kim Won-kyung (Ryu's associate); and

21.     Kwon Gi-rak (J.Y. Chun's business associate).

29. J.Y. Chun, Ryu, and the J.Y. Chun Fund Nominees engaged in a series of transactions during the Relevant Period in which millions of dollars worth of bearer bonds traceable to President Chun's Secret Fund were redeemed and used to open multiple J.Y. Chun Fund Nominee Accounts in Korea. During this same

time period, J.Y. Chun acquired numerous assets in Korea and the United States, including the Georgia Property valued at approximately $365,000, which he purchased in May 2003.

30.   When J.Y. Chun was questioned in 2013 by the Korean Prosecutor about the funds he maintained in these J.Y. Chun Fund Nominee Accounts, J.Y. Chun acknowledged that the funds in these accounts originated from his father. Although J.Y. Chun initially claimed to the Korean Prosecutor that he "never thought of the money [in the J.Y. Chun Fund Nominee Accounts] as belonging to [his] father," he later acknowledged "I always thought of [the funds in the J.Y. Chun Fund Nominee Accounts] unconditionally as my father's money.  It is true that I did as such.  I am very sorry about that now."

31.   **December 2000 Transaction**: In or around December 2000, J.Y. Chun received $7.355 million in National Housing Corporation bearer bonds ("Housing Bonds") from General Lee.  According to Ryu, these Housing Bonds were acquired with funds traceable to President Chun's Secret Fund.[4]  Indeed, President Chun also admitted to the Korean Prosecutor that these Housing Bonds were acquired with his funds.

32.   Soon after receiving these bonds, in or around December 19, 2000, J.Y. Chun instructed Ryu to distribute KRW 1.3 billion (approximately $1.3 million (USD)) in cash to various J.Y. Chun Fund Nominees.  Ryu distributed these funds in KRW 50 million (approximately $50,000 (USD)) increments and caused them to be deposited into twenty-six (26) different J.Y. Chun Fund Nominee Accounts.

---

[4] In addition to the KRW 7.355 billion in Housing Bonds provided to J.Y. Chun by President Chun, J.Y. Chun also received an additional KRW 9.34 billion (approx. $9.34 million (USD)) in "National Housing" bonds from General Lee. Although Korean prosecutors alleged in 2004 that these bonds were acquired with funds from President Chun's Secret Fund, the Korean Prosecutor was unable to obtain a conviction as to these additional allegations.  When Korean prosecutors again inquired of J.Y. Chun in 2013 how these bonds were purchased by General Lee, J.Y. Chun could provide no explanation as to the source of the funds used to acquire these bonds.

Within two days of these funds being deposited, Ryu then withdrew on J.Y. Chun's behalf KRW 700 million (approximately $700,000 (USD)) of these funds in cash from the aforementioned accounts.

33. **June 2001 Transaction**: In June 2001, J.Y. Chun asked Ryu to find additional nominees who would be willing to redeem an additional KRW 1.5 billion (approximately $1.5 million (USD)) in bearer bonds on his behalf. Ryu recruited fourteen individuals, including Ryu's mother, Ryu's maternal aunt, the daughter-in-law of Ryu's maternal aunt, former colleagues of Ryu's from the military, and various friends and third parties. After Ryu distributed the bonds to these individuals in increments of between KRW 50 million (approximately $50,000 (USD)) and KRW 100 million (approximately $100,000 (USD)), these J.Y. Chun Fund Nominees, in turn, redeemed the relevant bonds and provided the proceeds to Ryu, who then provided the funds to J.Y. Chun in the form of bank checks.

34. **September 2001 Transaction**: In September 2001, Ryu asked Kim Cheul-soo, a friend of his, to open a brokerage account at the Seoul office of E-Trade (the "Nominee E-Trade Account"), a stock brokerage firm, in order to redeem and hold additional bearer bonds for J.Y. Chun. Soon after opening this account, J.Y. Chun asked that Ryu redeem a bearer bond worth KRW 4.3 billion (approximately $4.3 million (USD)) through the Nominee E-Trade Account. According to Ryu, J.Y. Chun waited outside and declined to enter E-Trade's offices while Ryu was inside redeeming the aforementioned bond. Later that month, Kwon Gi-rak ("Kwon"), J.Y. Chun's business associate and friend, withdrew these funds and delivered the proceeds directly to J.Y. Chun.

35. **September 10, 2001, Transaction**: Again, in or around September 10, 2001, J.Y. Chun asked Ryu to use the Nominee E-Trade Account to redeem an additional KRW 8.4 billion (approximately $8.4 million (USD)) in bearer bonds. Like the last time, J.Y. Chun waited outside in his car while Ryu entered E-

Trade's offices to deposit the bonds.  Later that month, Kwon was again directed by J.Y. Chun to withdraw these funds and deliver the proceeds directly to him.

36. **March 19, 2002, Transaction**: In or around March 19, 2002, approximately 14 months before J.Y. Chun acquired the Georgia Property, J.Y. Chun asked that Ryu use the Nominee E-Trade account a third time to redeem a bond with a value of KRW 1 billion (approximately $1 million (USD)).  Again, J.Y. Chun waited outside while Ryu went inside E-Trade's offices to deposit the bond on J.Y. Chun's behalf.  Later that month, Kwon again withdrew these funds and delivered the proceeds directly to J.Y. Chun.

37. **September 2003**: In or around September 2003, four months after J.Y. Chun acquired the Georgia Property, J.Y. Chun directed Ryu to withdraw KRW 837,921,557 (approximately $837,000 (USD)) in securities being maintained on J.Y. Chun's behalf in a brokerage account at Hyundai Securities in Ryu's father's name.  After withdrawing these funds, Ryu provided the funds to Park Joo-ah, J.Y. Chun's sister-in-law, in the parking lot of the Hyundai Apartment Complex in Seoul.

38. In 2004, the Korean Prosecutor investigated and charged J.Y. Chun for criminal tax evasion because of his failure to report the funds he received from President Chun's Secret Fund, including approximately KRW 7.355 Billion (approximately $7.355 million (USD)) in Housing Bonds he received in December 2000 from his grandfather General Lee.  These Housing Bonds were purchased with funds traceable to President Chun's Secret Fund.  J.Y. Chun was ultimately convicted at trial and received a suspended sentence of 30 months imprisonment for this offense.

**D.  J.Y. Chun Used Funds in the Secret Fund Nominee Accounts to Acquire Assets and Make Further Investments in Korea**

39. J.Y. Chun used the funds in the Secret Fund Nominee Accounts to acquire assets in Korea, including a home in Seoul and three townhomes in the

Junart Vill complex ("Junart Units"), also in Seoul, valued at in or around $2.6 million (USD).  J.Y. Chun also invested KRW 700 million (approximately $700,000 (USD)) in Ware Valley, Inc. ("Ware Valley"), his failed technology firm.  J.Y. Chun appointed Ryu to be this firm's chief executive officer.  According to Ryu, however, Ware Valley never generated a profit.

40.  In acquiring these Korean assets, J.Y. Chun held these assets in the names of nominees.  For instance, in acquiring the Junart Units, J.Y. Chun instructed Ryu to title these properties in Ryu's father's name.  Ryu explained to the Korean Prosecutor in 2013 that the Junart Units were titled in his father's name because J.Y. Chun did not possess sufficient legitimate income to explain his acquisition of such assets, and J.Y. Chun wished to, in his words, "dodge suspicion."

### E. The Defendant Funds Are Traceable to Chun's Secret Funds

41.  During the same time period that J.Y. Chun received approximately $23 million worth of funds traceable to his father's Secret Fund, J.Y. Chun opened multiple bank accounts in the United States, funneling hundreds of thousands of dollars traceable to President Chun's Secret Fund into the U.S. financial system to acquire assets in the United States.  Ultimately, J.Y. Chun and Park used funds traceable to President Chun's Secret Fund to acquire the Georgia Property for $365,000 in 2003.  J.Y. Chun then sold the Georgia Property in 2004 and contributed the proceeds to the acquisition of the Newport Beach Property that was purchased for $2.24 million in 2005.

42.  J.Y. Chun possessed no significant source of income other than funds traceable to Chun's Secret Fund at the time he purchased the Georgia Property in 2003 and the Newport Beach Property in 2005.  Indeed, as described in Table 2 below, J.Y. Chun's income by his own admission to the Korean government was less than $56,000 per year from 1999 through 2005, woefully less than an annual

amount necessary to acquire the more than $20 million in assets held by nominees for J.Y. Chun's benefit during the Relevant Period.  Specifically, J.Y. Chun reported in his tax filings with the Korean government that he earned the following income:

**Table 2**
**J.Y. Chun's Reported Income**
**1999-2005**

| Tax Year | Amount Reported (in KRW) | Amount Reported (Approx. USD Equivalent) |
|---|---|---|
| 1999 | 43,962,283 | $43,963 |
| 2000 | 34,054,996 | $34,055 |
| 2001 | 37,661,360 | $37,662 |
| 2002 | 27,120,110 | $27,121 |
| 2003 | 55,754,800 | $55,755 |
| 2004 | 47,114,312 | $47,115 |
| 2005 | 23,269,967 | $23,270 |

43.  Indeed, although J.Y. Chun sought to operate a Korean technology firm, Ware Valley, with Ryu, and create a U.S. start-up software firm called OR Solutions in 2003, neither firm ever generated a profit.  Indeed, OR Solutions never generated any revenue at all.

**a.  J.Y. Chun Acquired the Georgia Property with Funds Traceable to Chun's Secret Fund in 2003**

44.  Park (J.Y. Chun's wife) acquired the Georgia Property for $365,000 on or about May 15, 2003.  Park paid for the Georgia Property in full without any financing from a third party.  The funds used to acquire the Georgia Property are

traceable to President Chun's Secret Fund.

45. Although the Georgia Property was titled in Park's name, she acknowledged to the Korean Prosecutor that the Georgia Property belonged to her husband, J.Y. Chun, and that his money was used to acquire this asset. Less than six months after acquiring the Georgia Property, Park transferred ownership of the Georgia Property to the XXXX Lake Heights Circle Trust, listing Yoon Yang Ja (Park's mother) as its sole trustee. As noted above in paragraph 28, Yoon was one of the J.Y. Chun Fund Nominees used to launder the proceeds of President Chun's Secret Fund.

46. The funds used to acquire the Georgia Property were wired into the United States from Korea between on or about April 14, 2003, and April 24, 2003. Details relating to these wires are outlined below in Table 3. These funds, according to J.Y. Chun and Park, were used to acquire the Georgia Property, to pay for their general living expenses and to finance the establishment of OR Solutions, a start-up technology firm that J.Y. Chun hoped to operate in Georgia with Rick Yi.

47. As reflected in Table 3 below, some of these wires were first sent from Korea to an account number XXXXXXXXX8170 at First Union Bank opened under the name Solora, Inc. (the "Solora Account"). Prior to July 11, 2003, Solora's legal name was OR Solutions. The Solora Account was opened by J.Y. Chun and Rick Yi in 2003. The majority of the funds, outlined in Table 3, were then funneled through the Solora Account to Park's personal bank account at First Union Bank ("Account 2808"), which was also opened on or about April 1, 2003, and another account opened by J.Y. Chun and Rick Yi at First Union Bank in the name of OR Solutions.

48. Three days after the final wires described in Table 3 were sent to the Solora Account, J.Y. Chun and Park moved to Georgia. Each of these transfers were sent from various J.Y. Chun Fund Nominee Accounts within one month of

J.Y. Chun and Park acquiring the Georgia Property.

**Table 3**
**Wires Sent Between April 15-24, 2003, to Finance**
**Acquisition of Georgia Property**

| Date | Nominee Account | Description |
|---|---|---|
| April 24, 2003 | $187,174 Wired from Yoon's Shinhan Bank Account to the Solora Account | Source of the Funds Described Further in Paragraphs 50 through 53 |
| April 24, 2003 | $9,980 Wired from Kwon's Shinhan Bank Account to the Solora Account | Source of the Funds Described Further in Paragraphs 54 through 56 |
| April 24, 2003 | $599,980 Wired from J.Y. Chun's Shinhan Bank Account to the Solora Account | Source of the Funds Described Further in Paragraphs 57 through 61 |
| May 6, 2003 | $317,085 Transferred from the Solora Account to Account 2808 | Details Described Further in Paragraph 49 |

49.   On May 6, 2003, bank records show that two deposits of $297,085 (USD) and $20,000 (USD), respectively, were made into Account 2808. That same day, a check for $360,000 was drawn on Account 2808. Prior to May 6, 2003, Account 2808 had already received approximately $49,968 in the form of five wires from various Secret Fund Nominee Accounts in Korea. Soon thereafter, J.Y. Chun and Park acquired the Georgia Property for $360,000 (USD) on May 15, 2003.

///
///
///
///

### 1. The $187,194 (USD) Wire from Yoon's Shinhan Bank Account Used to Acquire the Georgia Property Is Traceable to Chun's Secret Fund

50.  On or about April 24, 2003, J.Y. Chun directed his business associate Kwon to wire approximately $187,194 (USD) from a J.Y. Chun Fund Nominee Account held in Yoon's name at Shinhan Bank to the Solora Account.  Kwon possessed control over Yoon's account pursuant to a power of attorney executed by Yoon.  Both J.Y. Chun and Park acknowledged to the Korean Prosecutor that this $187,194 wire was used in part to acquire the Georgia Property.  These funds are traceable to President Chun's Secret Fund.

51.  When J.Y. Chun was interviewed by the Korean Prosecutor in 2013, he acknowledged that the funds in Yoon's account belonged to him and that the funds in Yoon's account were from his father.  J.Y. Chun further acknowledged that in sending this wire from Yoon's account, a financial disclosure form was falsified—J.Y. Chun represented that the funds in this wire were from Yoon's sale of real property in Korea, when in fact all of these funds originated from J.Y. Chun's father.  J.Y. Chun explained to the Korean Prosecutor that he used Yoon's account to send this wire, rather than an account in his own name, because he could not identify a legitimate source for this money.

52.  Similarly, when Yoon was interviewed by the Korean Prosecutor, she also confirmed that none of the funds in this account belonged to her, that she had never heard of Solora before, and that she had nothing to do with the transmission of this wire to the Solora Account.

53.  According to Park, who was also interviewed by the Korean Prosecutor, her husband (J.Y. Chun) used her mother's (Yoon's) "account [whenever] he didn't want to reveal his own funds."  In sending this particular wire on April 23, 2003, Park concluded that J.Y. Chun used her mother's account because her husband "had no money with a source that could be shown."  Park

explained further: "[B]efore going to the U.S. [J.Y. Chun] had to take money with him to buy a house and for living expenses, and [J.Y. Chun] said that if he sent money to the U.S. the source would be obvious; since [J.Y. Chun's] money had no source, in order to transfer money with a source" he used her mother's (Yoon's) account.

## 2.   The $9,980 (USD) Wire from Kwon's Shinhan Bank Account Used to Acquire the Georgia Property Is Traceable to Chun's Secret Fund

54.   In or around April 24, 2003, J.Y. Chun directed Kwon to send a second wire for $9,980 to the Solora Account from an account opened in Kwon's name at Shinhan Bank, the same bank that was used to send $187,194 (USD) from Yoon's account.  Both J.Y. Chun and Park acknowledged to the Korean Prosecutor that these funds were used in part to acquire the Georgia Property.  The source of these funds, which were used in part to acquire the Georgia Property, is traceable to President Chun's Secret Fund.

55.   When J.Y. Chun was interviewed by the Korean Prosecutor in 2013, he acknowledged that the funds he maintained in the names of the J.Y. Chun Fund Nominees, of which Kwon was one, were traceable to his "father's funds."

56.   Likewise, when Kwon was approached by the Korean Prosecutor in 2013, he confirmed in a written statement that during the Relevant Period, he assisted J.Y. Chun in managing the funds deposited in the J.Y. Chun Nominee Accounts.  For instance, in August 2003, Kwon withdrew cash from a safe deposit box in Seoul that he maintained for J.Y. Chun in order to wire $10,000 (USD) to Account 2808 in August 2003.  Similarly, during the Relevant Period, Kwon withdrew in or around $6 million (USD) worth of funds from the E-Trade Nominee Account in 2001 and 2002—within one year of J.Y. Chun's purchase of the Georgia Property—and delivered these funds to J.Y. Chun.  As explained above in paragraphs 34 through 36, the E-Trade Nominee Account contained

funds traceable to Chun's Secret Fund.

**3.  The $599,980 (USD) Wire from J.Y. Chun That Was Used In Part to Acquire the Georgia Property Is Also Traceable to Chun's Secret Fund**

57.  On April 24, 2003, J.Y. Chun caused a third wire for $599,980 (USD) to be wire transferred from Account Number XXX-XXX-838485 held in his name at Shinhan Bank in Korea to the Solora Account.  As noted above at paragraphs 50 and 54, Shinhan Bank is the same bank that J.Y. Chun used to maintain Secret Fund Nominee Accounts in the names of both Kwon and Yoon.  After being deposited initially in the Solora Account, these funds were then transferred to other accounts, including Account 2808 and OR Solutions' account at First Union Bank.  The source of these funds, which were used in part to acquire the Georgia Property, is traceable to Chun's Secret Fund.

58.  Specifically, in the five-week period preceding this wire, two deposits totaling in or around $784,835 (USD) in Korean currency were made into J.Y. Chun's Shinhan bank account.  The first deposit was for KRW 364,835,426 (approximately $364,835 (USD)) on March 18, 2003, from '20 Daim Corporate Restructuring ("Daim"), described below in paragraph 60.  A second deposit was for KRW 420,000,000 (approximately $420,000 (USD)) on March 21, 2003, from the sale of J.Y. Chun's membership in the Hwasan Country Club ("Hwasan Club"), described below in paragraph 61.  Both deposits were made into J.Y. Chun's account within two months of his purchase of the Georgia Property.

59.  The original source of the Daim and Hwasan Club funds was President Chun's Secret Fund.

60.  **Daim Deposit**: Daim is a consulting firm operated by Ryu's high school classmate.  J.Y. Chun retained Daim to recover a failed investment he had made in a technology company prior to 2003.  The funds J.Y. Chun received from Daim on March 18, 2003, was a portion of that failed investment.  J.Y. Chun's

original investment in this firm was made during the Relevant Period, a time period in which J.Y. Chun was not gainfully employed and possessed no income or assets other than the proceeds of his father's Secret Fund.   Indeed, in 2013, Ryu informed the Korean Prosecutor that J.Y. Chun used funds traceable to Chun's Secret Fund to originally invest in the aforementioned failed technology company.  When, however, the Korean Prosecutor asked J.Y. Chun about the source of the funds he used to make this investment, J.Y. Chun said that he could not recall the source of these funds but acknowledged that some of the funds in the J.Y. Chun Fund Nominee Accounts were "probably" used to make this investment.

61.  **Hwasan Club Deposit**: J.Y. Chun originally purchased a Hwasan Club membership for KRW 401.5 million (approximately $401,500 (USD)) during the Relevant Period, a time period in which J.Y. Chun was not gainfully employed and possessed no income or assets other than his father's Secret Fund proceeds. According to Ryu, this membership was also acquired with funds traceable to Chun's Secret Fund.  In selling the club membership, the purchaser acquired J.Y. Chun's membership with a check for KRW 420,000,000 (approximately $420,000 (USD)) drawn on a branch of Shinhan Bank located in Tehran.  When, however, the Korean Prosecutor asked J.Y. Chun about the source of the funds he used to acquire the Hwasan Club membership, J.Y. Chun claimed that he could not recall.

62.  After acquiring the Georgia Property on May 15, 2003, J.Y. Chun sold the Georgia Property for $403,800 (USD) in or around April 23, 2004.  The proceeds of the sale, amounting to in or around $381,365.46 (USD) were deposited in Account 2808 on or about May 11, 2004.

63.  In or around December 2003, when OR Solutions terminated operations in Georgia, J.Y. Chun transferred the remaining funds amounting to in or around $300,000 (USD) in OR Solutions' account at First Union Bank to a personal account in his name.

### F. **In 2005, J.Y. Chun Used at Least $681,365 Traceable to Chun's Secret Fund to Acquire the Newport Beach Property for $2.24 Million (USD)**

64.  On or about September 9, 2005, J.Y. Chun and Park purchased the Newport Beach Property, for $2,240,000 (USD).  J.Y. Chun and Park paid a total down payment of $896,000 ("Down Payment") and financed the remaining $1,344,000 due through a mortgage loan obtained from Washington Mutual Bank (now J.P. Morgan Chase).  J.Y. Chun and Park used at least in or around $681,365 in funds traceable to Chun's Secret Fund to make the Down Payment for their acquisition of the Newport Beach Property.

65.  The Newport Beach Property was titled originally only in Park's name.  However, the closing and escrow documents state that J.Y. Chun and Park jointly purchased the Newport Beach Property, listing both individuals as the property's "Buyers."  Likewise, the funds for the Down Payment were obtained from bank accounts in the names of both J.Y. Chun and Park at Citibank.

66.  Less than two weeks after acquiring the Newport Beach Property, ownership of the Newport Beach Property was transferred to the Port Manleigh Trust, again listing Yoon (Park's mother) as its sole trustee.  The trust documents, however, state that the beneficiary of the trust is J.Y. Chun.

67.  Although Yoon was purportedly selected to be the Newport Beach Property's trustee in order to manage the property, Yoon has lived in Korea since May 2005 and abandoned her U.S. permanent resident status in 2008.  Furthermore, despite the fact that she was purportedly the property's "manager," Yoon conceded to the Korean Prosecutor in 2013 that she did not know how the Newport Beach Property's mortgage was paid, who was currently residing in the property, or even whether the Newport Beach Property was titled in the name of a trust.  Specifically, Yoon explained to the Korean Prosecutor:

> I was asked to sign a document as [Park] my eldest daughter was saying she needed the house managed and I did that once.  Anyway, beyond [that which is] related to managing, I do not know anything.

Now, I hear the name has changed as if it's a corporate body that I am managing, and I do not know about that as well.

### a. The Funds Used for the Newport Beach Property's Down Payment Is Traceable to Chun's Secret Fund

68.   J.Y. Chun and Park funded the down payment on the Newport Beach Property from three sources:  (i) a wire sent by J.Y. Chun from his Citibank account for $842,334.61 (USD) to Mariners Escrow, the escrow company that handled the sale of the Newport Beach Property, on or about September 27, 2005; (ii) a check dated August 28, 2005, for $67,200 (USD) from Park's Citibank account; and (iii) a check dated September 9, 2005, for $398.77 (USD) from that same Citibank account.

69.   When J.Y. Chun and Park were interviewed by the Korean Prosecutor in 2013, they confirmed that they applied the proceeds of the sale of the Georgia Property (totaling in or around $381,365.46 (USD)) in 2004 toward the Newport Beach Property's Down Payment.  In addition, J.Y. Chun obtained money from two additional sources to make the Down Payment—(1) a $300,000 (USD) wire transmitted from a Korean account at Hana Bank in Park's name into the United States on October 17, 2003 ("Hana Wire"); and (2) $180,000 in funds that Yoon purportedly loaned to Chun and Park.  The funds in the Hana Wire are also traceable to Chun's Secret Fund.

### b. The Hana Wire Is Traceable to Chun's Secret Fund

70.   In or around October 17, 2003, Park Joo-ah (Park's sister)—at J.Y. Chun's direction—transmitted the Hana Wire to Account 2808 in Georgia.  As described below, these funds, which were used to make the Down Payment on the Newport Beach Property, are traceable to Chun's Secret Fund.

71.   Approximately eight days prior to this wire being transmitted, Park Joo-ah received in or around KRW 837,921,557 (approximately $837,000 (USD)) in securities traceable to Chun's Secret Fund from Ryu.  Specifically, Ryu

provided stock certificates for various Korean securities to Park Joo-Ah.  These securities were formerly maintained by Ryu at a brokerage account in his father's name at Hyundai Securities, a securities brokerage firm in Seoul.  These securities included 88,015 shares of Luxon Energy, 34,900 shares of Daeduck Energy, 21,308 shares of Iljin Display, 11,000 shares of Taekyung Industries, 600 shares of Kyeong Dong Drug Industries, and 100 shares of Samjin Pharmaceuticals.  Ryu acknowledged to the Korean Prosecutor that his father's brokerage account was used to maintain funds traceable to Chun's Secret Fund.  Indeed, as noted above at paragraph 30, J.Y. Chun also confirmed that the funds he deposited in the names of various J.Y. Chun Fund Nominees, of which Ryu's father was one, were traceable to his "father's funds."

72. Similarly, in the three month period preceding the transmission of the Hana Wire to the United States, Kwon also deposited KRW 30 million (approximately $30,000 (USD)) into Park's account at Hana Bank –from where the Hana Wire was transmitted.  Specifically, Kwon deposited KRW 26 million (approximately $26,000 (USD)) into this account on or around July 29, 2003, and another KRW 4 million (approximately $4,000 (USD)) on or around September 4, 2003.  Kwon, as noted above at paragraphs 34 through 36, was J.Y. Chun's business associate and one of the principal J.Y. Chun Fund Nominees used by J.Y. Chun and Ryu to withdraw and assist in managing funds stored in various J.Y. Chun Nominee Accounts.

73. Park, however, claimed to the Korean Prosecutor that in sending the Hana Wire, J.Y. Chun used funds that she obtained from a security deposit she had redeemed to operate a food court concession ("Aekyoung Food Court Concession") at the Aekyoung Department Store.  In reality, the money for the security deposit came from various third parties.  Specifically, in 2001, various third parties paid in or around KRW 357.2 million (approximately $357,000 (USD)) on Park's behalf for this security deposit.  When the Korean Prosecutor

inquired about the identity of these third parties and the source of the funds used to pay for the security deposit, both Park and J.Y. Chun claimed they could not recall where or how Park specifically obtained the money for the security deposit.

74. The source of the funds used to pay for the aforementioned security deposit, according to Ryu, is also traceable to President Chun's Secret Fund. Ryu recalled that J.Y. Chun—not Park—was overseeing and managing the Aekyoung Food Court Concession.

75. Furthermore, Ryu explained to the Korean Prosecutor that when he visited the Aekyoung Department Store with Park and J.Y. Chun during the Relevant Period, neither Park nor J.Y. Chun had sufficient assets or a legitimate income to pay for the security deposit. Ryu stated: "[J.Y. Chun] didn't have a particular job or income. He didn't have to borrow money from anyone since it was sufficient for him to live off of his father's Secret funds."

76. Indeed, according to J.Y. Chun's and Park's respective income tax returns filed with the Korean government for the 2001 tax year, the cost of the security deposit was not consistent with their reported income. Specifically, Park reported that she earned 168,373,968 KRW (approximately $168,374) in 2001 and 27,117,518 KRW (approximately $27,118) in 2000. Likewise, J.Y. Chun reported that he earned 37,661,360 KRW (approximately $37,662) in 2001 and 34,054,996 KRW (approximately $34,054) in 2000.

77. Furthermore, in sending the Hana Wire, Park Joo-ah falsified a financial disclosure form required under Korean law. Specifically, Park Joo-ah represented to the Korean government that the funds were being transmitted to establish a company called Evada, Inc. in Georgia. In reality, however, the funds were wired directly into Account 2808, Park's personal account, and used to (i) pay for the general living expenses of J.Y. Chun and Park in Georgia, and (ii) make an investment in the Voyager Fund, an investment fund based in the United States. Evada was formed only two days prior to the Hana Wire being

1  transmitted.  Indeed, according to a senior OR Solutions officer with whom Park

2  consulted about forming this company, Evada was another "paper company" with

3  no employees, operations, or commercial income.

4        78.  J.Y. Chun and Park concealed their acquisition of both the Georgia

5  Property and the Newport Beach Property from the Korean government in

6  violation of Korean law, which criminalizes concealing property overseas under

7  the Act on the Aggravated Punishment of Specific Economic Crimes.  Although

8  J.Y. Chun and Park were both required under Korean law to disclose these asset

9  purchases to the Korean National Tax Service, they acknowledged to the Korean

10  Prosecutor in 2013 that no such disclosure was made.

11        79.  In addition, in connection with his acquisition of the Newport Beach

12  Property, J.Y. Chun originally claimed to Korean investigators in 2007 that he

13  obtained in or around $750,000 from Yoon to finance the Newport Beach

14  Property's down payment.  Yoon, however, denied to the Korean Prosecutor she

15  ever provided J.Y. Chun with such funds.

**G. In Addition to Using President Chun's Secret Fund to Acquire the Newport Beach Property, Park Defrauded and Made False Statements to Washington Mutual Bank In Obtaining a Mortgage Loan for $1.344 Million (USD)**

20        80.  In addition to using President Chun's Secret Fund to finance the

21  Newport Beach property's Down Payment, Park orchestrated a scheme to

22  fraudulently obtain a mortgage loan from Washington Mutual Bank in order to

23  acquire the Newport Beach Property.

24        81.  On or about September 23, 2005, Park applied to receive a mortgage

25  loan for $1,344,000 (USD) from Washington Mutual Bank.  Although Park

26  acknowledged in a Uniform Residential Loan Application ("Loan Application")

27  that the information she provided to Washington Mutual Bank in connection with

28  her credit application was "true and correct" and that "any intentional or negligent

misrepresentation[s]" may result in "criminal penalties including, but not limited to, fine or imprisonment or both . . . ," her Loan Application contained material misrepresentations of fact regarding both her employment status and the source of her wealth.

82. Specifically, Park represented in her Loan Application that:

(i)     she was employed as the president of an import-export company called Samwon America LLC ("Samwon") when, in fact, she had not been employed since 2003;

(ii)    she was employed as Samwon's president since 2003 when, in fact, Samwon was only formed on May 6, 2005—less than five months before Park signed the Loan Application;

(iii)   Samwon was located at an address on Wilshire Boulevard in Los Angeles, California, when, in fact, that location was occupied by the Brentwood Postal Center, a mailbox leasing business; and

(iv)    Samwon engaged in an import and export business when, in fact, this company engaged in no such business, according to U.S. Department of Commerce records, and has never filed an income tax return with the California Franchise Board.

83. Park further represented to Washington Mutual Bank that she earned an annual income of $478,800 per year when, in fact, Park (i) represented to the United States Citizenship and Immigration Service in 2009 that she had not been employed since 2003, (ii) informed the Korean Prosecutor in 2013 that she had not been employed since 2002; and (iii) reported no income in her Korean income tax filings since the 2003 tax year.

84. Even when Park was employed prior to 2003, her income was substantially lower than what she represented to Washington Mutual Bank. Specifically, according to Park's income tax filings with the Korean government, she earned (i) 30,545,591 KRW (approximately $30,545) in 1995; (ii) 49,559,995

KRW (approximately $45,559) in 1996; (iii) 10,468,830 KRW (approximately $10,468) in 1997; (iv) 22,232,330 KRW (approximately $22,232) in 1998; (v) 19,369,808 KRW (approximately $19,369) in 1999; (vi) 27,117,518 KRW (approximately $27,117) in 2000; (vii) 168,373,968 KRW (approximately $168,373) in 2001; (viii) 75,772,028 KRW (approximately $75,772) in 2002; and (ix) 47,475,540 KRW (approximately $47,475) in 2003.

85.  Based in part upon these false representations, Washington Mutual Bank approved Park's Loan Application and provided her with a mortgage loan of approximately $1,344,000 to acquire the Newport Beach Property.  These funds were then used by Park and J.Y. Chun to acquire the Newport Beach Property in September 2005.

86.  On or about February 11, 2014, the Newport Beach Property was sold for approximately $2,120,465.92.  The proceeds of that sale were deposited into an escrow account held in the name of Century 21 Sunny Hills Escrow Division at Uniti Bank in California.  And then on or about February 12, 2014, pursuant to a federal seizure warrant, the Federal Bureau of Investigation seized the defendant $726,951.45 in bank funds from Century 21 Sunny Hills' Uniti Bank account XXXXX-1091which represents the net sale proceeds that would have been paid to Park's mother Yoon, as the trustee of the Port Manleigh Trust.

## IV.
## FOREIGN LAW
## BASIS FOR FORFEITURE

87. Bribery of a public official is a criminal offense under Korean law, as enumerated by the Korean Criminal Code, including but not limited to Article 129 (bribery); Article 130 (bribery of third persons); Article 131 (improper action after acceptance of bribe and subsequent bribery); and Article 132 (acceptance of bribes through good offices).  English translations of these provisions are set forth in Attachment A.

# FIRST CLAIM FOR RELIEF
## (18 U.S.C. § 981(a)(1)(C))

88. Paragraphs 1 through 87 above are incorporated by reference as if fully set forth herein.

89. The Defendant Funds are property that constitute, or are derived from, proceeds traceable to a violation of (i) a foreign offense involving bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) domestic bank fraud (18 U.S.C. § 1344); and/or (iii) making false statements to a financial institution (18 U.S.C. § 1014), specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.

90. Therefore, the Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

# SECOND CLAIM FOR RELIEF
## (18 U.S.C. § 981(a)(1)(A))

91. Paragraphs 1 through 90 above are incorporated by reference as if fully set forth herein.

92. The Defendant Funds are involved in, or are traceable to property involved in, a transaction or attempted transaction in violation of section 18 U.S.C. § 1957. Specifically, the Defendant Funds are involved in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activities, that is (i) a foreign offense involving bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) domestic bank fraud (18 U.S.C. § 1344); and/or (iii) making false statements to a financial institution (18 U.S.C. § 1014).

93. Accordingly, the Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

///
///

### THIRD CLAIM FOR RELIEF
(18 U.S.C. §981(a)(1)(A))

94.  Paragraphs 1 through 93 above are incorporated by reference as if fully set forth herein.

95. The Defendant Funds are involved in, or are traceable to property involved in, a transaction or attempted transaction in violation of section 18 U.S.C. § 1956(a)(1)(B)(i).  Specifically, the Defendant Funds are involved in a financial transaction involving the proceeds of specified unlawful activities, that is (i) a foreign offense involving bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) domestic bank fraud (18 U.S.C. § 1344); and/or (iii) making false statements to a financial institution (18 U.S.C. § 1014), and which were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

96.  Accordingly, the Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### FOURTH CLAIM FOR RELIEF
(18 U.S.C. §981(a)(1)(A))

97. Paragraphs 1 through 96 above are incorporated by reference as if fully set forth herein.

98. The Defendant Funds are involved in, or are traceable to property involved in, a transaction or attempted transaction in violation of section 18 U.S.C. § 1956(a)(2)(B).  Specifically, the Defendant Funds were, or are traceable to funds that were, transported, transmitted, or transferred to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation,

transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is a foreign offense involving bribery of a public official (18 U.S.C. § 1956(c)(7)(B).

99. Accordingly, the Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FIFTH CLAIM FOR RELIEF
### (18 U.S.C. §981(a)(1)(A))

100. Paragraphs 1 through 99 above are incorporated by reference as if fully set forth herein.

101. The Defendant Funds are involved in, or are traceable to property involved in, a conspiracy to launder the proceeds of specified unlawful activities in violation of 18 U.S.C. § 1956(h).  Specifically, the Defendant Funds are involved in, or are traceable to funds that were involved in, a conspiracy:  (1) to conduct and/or attempt to conduct financial transactions which involve the proceeds of specified unlawful activities, that is (i) a foreign offense involving bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) domestic bank fraud (18 U.S.C. § 1344); and/or (iii) making false statements to a financial institution (18 U.S.C. § 1014), in violation of 18 U.S.C. § 1956(a)(1)(B)(i); (2) to engage  and/or attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activities, that is (i) a foreign offense involving bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) domestic bank fraud (18 U.S.C. § 1344); and/or (iii) making false statements to a financial institution (18 U.S.C. § 1014), in violation of 18 U.S.C. § 1957; and (3) to transport, transmit, or transfer to a place in the United States from or through a place outside the United States, knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the

ownership, or the control of the proceeds of specified unlawful activities, that is (i) a foreign offense involving bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) domestic bank fraud (18 U.S.C. § 1344); and/or (iii) making false statements to a financial institution (18 U.S.C. § 1014)), in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

102. Accordingly, the Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a)   due process issue to enforce the forfeiture of the Defendant Funds;

(b)   due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)   that this Court decree forfeiture of the Defendant Funds to the United States of America for disposition according to law; and

(d)   for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED: April 23, 2014          JAIKUMAR RAMASWAMY, CHIEF
                               ASSET FORFEITURE AND MONEY
                                 LAUNDERING SECTION, Criminal Division


                               DANIEL H. CLAMAN, Assistant Deputy Chief
                               WOO S. LEE, Trial Attorney
                               Criminal Division
                               United States Department of Justice

                               ANDRÉ BIROTTE, JR., United States Attorney
                               STEVEN R. WELK, Assistant U.S. Attorney
                               Chief, Asset Forfeiture Section
                               KATHARINE SCHONBACHLER
                               Assistant United States Attorney
                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

## **VERIFICATION**

I, Stephanie L. Orrick, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, files and records compiled by the Supreme Prosecutor's Office of the Republic of Korea, the Ministry of Justice of the Republic of Korea and the Seoul Central District Prosecutor's Office, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of APRIL , 2014, at WEST COVINA, CA

Stephanie L. Orrick
Special Agent
Federal Bureau of Investigation

# ATTACHMENT A

## Relevant Bribery Provisions
## of the Korean Criminal Code

**Chapter VII Crimes Concerning the Duties of Public Officials:**

**Article 129 (Acceptance of Bribe and Advance Acceptance)**

A public official or an arbitrator who receives, demands or promises to accept a bribe in connection with his duties, shall be punished by imprisonment for not more than five years or suspension of qualifications for not more than ten years.

**Article 130 (Bribe to Third Person)**

A public official or an arbitrator who causes, demands or promises a bribe to be given to a third party on acceptance of an unjust solicitation in connection with his duties shall be punished by imprisonment for not more than five years or suspension of qualifications for not more than ten years.

**Article 131 (Improper Action after Acceptance of Bribe and Subsequent Bribery)**

(1) If a public official or an arbitrator takes an improper action after committing the offenses under the preceding two Articles, imprisonment for a limited term of not less than one year shall be imposed.

(2) If a public official or an arbitrator receives, demands or promises to receive a bribe, or causes, demands or promises a bribe to be given to a third party, after taking an improper action in the course of performing his duties, the punishment specified in the preceding paragraph shall be imposed.

**Article 132 (Acceptance of Bribe through Good Offices)**

A public official who, by taking advantage of his post, receives, demands or agrees to receive a bribe concerning the use of the good offices in connection with the affairs which belong to the functions of another public official, shall be punished by imprisonment for not more than three years or suspension of qualifications for not more than seven years.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____R. Gary Klausner_____ and to

Magistrate Judge _____Suzanne H. Segal_____ .

The case number on all documents filed with the Court should read as follows:

## 2:14-cv-03140-RGK(SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the assigned Magistrate Judge has been designated to hear discovery-related motions.  All discovery-related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____April 24, 2014_____                    By  APEDRO_____

Date                                                                 Deputy Clerk

---

## ATTENTION

*A copy of this Notice must be served on all parties served with the Summons and Complaint (or, in cases removed from state court, on all parties served with the Notice of Removal) by the party who filed the Complaint (or Notice of Removal).*

**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| United States of America | $726,951.45 in Uniti Bank Funds |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |
|---|---|
| Woo S. Lee, Trial Attorney, 1400 New York Avenue, N.W., 10th Floor Washington, D.C. 20530, Tel: (202) 514-1263, Woo.Lee@usdoj.gov Katharine Schonbachler, Assistant U.S. Attorney, 312 N. Spring Street, 14th Floor Los Angeles, CA 90012 Tel: (213)894-3172, Katie.Schonbachler@usdoj.gov | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. §§ 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☒ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: CV14-03140

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF? <br> Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? <br> Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☒ Yes  ☐ No | ☒ Los Angeles | ☐ Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

| C.1. Is either of the following true? If so, check the one that applies: | C.2. Is either of the following true? If so, check the one that applies: |
|---|---|
| ☐ 2 or more answers in Column C | ☐ 2 or more answers in Column D |
| ☐ only 1 answer in Column C and no answers in Column D | ☐ only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the <br> **SOUTHERN DIVISION.** <br> Enter "Southern" in response to Question D, below. <br><br> If none applies, answer question C2 to the right.  ➡ | Your case will initially be assigned to the <br> **EASTERN DIVISION.** <br> Enter "Eastern" in response to Question D, below. <br><br> If none applies, go to the box below.  ⬇ |

Your case will initially be assigned to the
**WESTERN DIVISION.**
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above:  ➡ | Western |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

    If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ NO ☐ YES

    If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☒ A. Arise from the same or closely related transactions, happenings, or events; or

                  ☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

                  ☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

                  ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** *Kathryn Schonbach*      DATE: April 23, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |